UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| BRUCE WINSTON GEM CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | 09 CIV 7352 (JGK) |
| HARRY WINSTON, INC. and | ) | |
| HARRY WINSTON S.A. | ) | ECF CASE |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS HARRY WINSTON, INC. AND HARRY WINSTON S.A.'S MOTION TO DISMISS

BRICKER & ECKLER, LLP
Joseph R. Dreitler (Admitted *pro hac vice*)
Mary R. True (Admitted *pro hac vice*)
100 S. Third Street
Columbus, Ohio  43215
Telephone: (614) 227-2300
jdreitler@bricker.com
mtrue@bricker.com

-and-

FROSS ZELNICK LEHRMAN & ZISSU, P.C.
Roger L. Zissu
Jason D. Jones
866 United Nations Plaza
New York, New York  10017
Telephone:  (212) 813-5900
rzissu@frosszelnick.com
jjones@frosszelnick.com
*Attorneys for Defendants
Harry Winston, Inc. and Harry Winston S.A.*

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

I.    INTRODUCTION ...................................................................................................... 2

II.   FACTS ........................................................................................................................ 2

      A.    Bruce Winston ................................................................................................ 2

      B.    The Opposition Proceedings – Procedural History ..................................... 4

      C.    The Evidence Submitted During HWI's Trial Period .................................. 5

III.  ARGUMENT ............................................................................................................. 8

      A.    There is No Substantial Controversy Between the Parties of Sufficient
            Immediacy and Reality to Warrant the Issuance of a Declaratory Judgment ........ 8

      B.    Plaintiff Has Not Demonstrated the Parties are in Adversarial Conflict by
            Alleging Conduct Evidencing a Definite Intent and Apparent Ability to
            Commence Use of the Bruce Winston Mark in an Infringing Manner ................ 13

      C.    BWGC is Asking this Court to Issue an Advisory Opinion .................................. 15

      D.    The Declaratory Judgment Act May Not be Used to Short Circuit
            Administrative Remedies ............................................................................... 16

IV.   CONCLUSION ........................................................................................................ 20

## TABLE OF AUTHORITIES

**Page**

## CASES

*800-Flowers, Inc. v. Intercontinental Florist,* 860 F. Supp. 128 (S.D.N.Y. 1994) .......................15

*AARP v. 200 Kelsey Associates, LLC et al,* 2009 U.S. Dist. LEXIS 969 (S.D.N.Y. January 9, 2009) (Lynch, J.) ..................................................................................9, 13, 16

*Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227 (1937) ..............................................................9, 15

*American Pioneer Tours Inc. v. Suntrek Tours Ltd.,* 1998 U.S. Dist. LEXIS 1527 (S.D.N.Y. 1998) ..................................................................................11, 18

*Barbarian Rugby Wear, Inc. v. PRL USA Holdings, Inc.,* 2006 U.S. Dist. LEXIS 50179 (S.D.N.Y. 2006) ..................................................................................10, 12

*Bausch & Lomb, Inc. v. CIBA Corp.,* 39 F. Supp. 2d 271 (W.D.N.Y. 1999) .........................11, 13

*Cardinal Chem. Co. v. Morton Int'l, Inc.,* 508 U.S. 83 (1993) .......................................................9

*Continental Connector Corp. v. Continental Specialties Corp., supra,* 413 F. Supp. 1347 (D. Conn. 1976) ..................................................................................20

*Eli's Chicago Finest, Inc. v. Cheesecake Factory, Inc.,* 23 F. Supp. 2d 906 (N.D.Ill. 1998) .......13

*Englishtown Sportswear, Ltd. v. Tuttle,* 547 F. Supp. 700, (S.D.N.Y. 1982) ...............................17

*Fairchild, Arabatzis & Smith, Inc. v. Sackheim,* 451 F. Supp. 1181 (S.D.N.Y. 1978) ................17

*Goya Foods, Inc. v. Tropicana Products, Inc.,* 666 F. Supp. 585 (S.D.N.Y. 1987) ...............11, 20

*Great American Ins. v. Houston General Ins.,* 735 F. Supp. 581 (S.D.N.Y. 1990) ......................15

*In re E.I. DuPont de Nemours & Co.,* 476 F.2d 1357 (CCPA 1973) ...............................................6

*Kenner Parker Toys, Inc. v. Rose Art Industries, Inc.,* 963 F.2d 350, (Fed. Cir. 1992).................8

*Manganaro Foods, Inc. v. Manganaro's Hero-Boy, Inc.,* 2002 U.S. Dist. LEXIS 12844 (S.D.N.Y. July 12, 2002) ..................................................................................19

*MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118 (2007) ................................................8, 9, 16

*Pocketmedicine.com, Inc. v. John Wiley & Sons, Inc.,* 2006 U.S. Dist. LEXIS 13617 (S.D.N.Y. Mar. 23, 2006)..................................................................................13, 16

*Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492 (2d Cir. 1961)...........................................6

*Progressive Apparel Group v. Anheuser-Busch, Inc.*, 1996 U.S. Dist. LEXIS 1292
(S.D.N.Y. 1996) ...................................................................................................2, 10

*Public Service Commions v. Wycoff Co.,*  344 U.S. 237 (1952) ...................................17

*Recot Inc. v. Becton*, 214 F.3d 1322 (Fed. Cir. 2000) ......................................................7

*Starter Corp. v. Converse, Inc.*, 84 F.3d 592 (2d Cir. 1996)..............................13, 14, 15

*Topp-Cola Co. v. Coca-Cola Co.,* 314 F.2d 124 (2d Cir. 1963) .......................10, 17, 18

*Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995).............................................................9

*Windsurfing Intern. Inc. v. AMF Inc.,*  828 F.2d 755 (Fed. Cir. 1987) ...................13, 15

## STATUTES

15 U.S.C. § 1052(d).........................................................................................................10

15 U.S.C. § 1071(b).........................................................................................................19

28 U.S.C. § 2201 ...............................................................................................................1

28 U.S.C. § 2201(a).....................................................................................................8, 16

## RULES

FRE 408(b) .......................................................................................................................11

Defendants Harry Winston, Inc. and Harry Winston, S.A. (collectively, "HWI") and Plaintiff Bruce Winston Gem Corp. ("BWGC") are parties to an Opposition proceeding in the Trademark Trial and Appeal Board ("TTAB") of the U.S. Patent & Trademark Office ("PTO") over BWGC's attempt to register the mark BRUCE WINSTON for jewelry.[1]   This TTAB Opposition proceeding has been pending since September of 2002.   Discovery has closed an the Opposition is in the Trial period.   Accordingly, HWI hereby submits its Motion to Dismiss the claims asserted by BWGC pursuant to 28 U.S.C. § 2201 on the grounds that the exercise of the Court's authority under the Declaratory Judgment Act would be improper because i) there is no substantial controversy between the parties of sufficient immediacy and reality to warrant the issuance of a declaratory judgment; ii) plaintiff has not demonstrated conduct evidencing a definite intent and apparent ability to commence use of the BRUCE WINSTON mark in an infringing manner; iii) plaintiff is improperly seeking an advisory opinion from this Court; and iv) reliance on the Declaratory Judgment Act is improper if it supplants matters properly before an administrative agency -- in this case, the TTAB.   For the reasons set forth herein, HWI respectfully requests this Court to dismiss BWGC's complaint for declaratory judgment.   In the alternative, HWI requests that this action be stayed pending resolution of Opposition No. 91153147 by the TTAB.

---

[1] A trademark Opposition is an administrative proceeding before the TTAB in which a person who believes that he, she or it "would be damaged by the registration of a mark on the Principal Register" can bring an action to try to prevent the application from being registered. The proceedings are generally conducted in accordance with the Federal Rules of Civil Procedure and Federal Rules of Evidence and can include significant written, document and deposition discovery as well as extensive trial testimony. The Opposer in an Opposition proceeding presents its evidence to the TTAB during its thirty-day Trial period, during which it takes the trial testimony of its witnesses and submits those transcripts, along with other evidentiary materials being relied upon via Notices of Reliance, and both sides submit a trial brief. The TTAB issues its rulings based upon the written submissions of the parties, and upon oral argument if requested by the parties. It does not hear live testimony.

## I.   INTRODUCTION

In *Progressive Apparel Group v. Anheuser-Busch, Inc.*, 1996 U.S. Dist. LEXIS 1292

(S.D.N.Y. 1996), Judge Cote came to a conclusion that is equally applicable in this case:

> The present dispute concerns only the registration of a trademark.
> There is no threat of an infringement suit, either direct or indirect,
> and there is no reasonable basis on which to conclude that this
> dispute will eventually develop into an infringement suit. The
> appropriate resolution of the only concrete dispute between the
> parties is a matter for Trademark Trial and Appeal Board. That
> dispute is currently before the Board. Defendant's motion to
> dismiss is accordingly granted.

After seven years of prosecuting this case before the TTAB, and *in the middle of Trial*,

BWGC has suddenly decided that now is the time to march into Federal court to seek an

advisory opinion giving guidance on how it might some day expand use of the mark BRUCE

WINSTON on jewelry.   A brief history of how this dispute has unfolded over the past several

years will reveal the true motivation behind BWGC's bizarre and desperate maneuver, and will

also demonstrate why, as Judge Cote noted, "the appropriate resolution of the only concrete

dispute between the parties is a matter for the Trademark Trial and Appeal Board."

## II.   FACTS

### A.   Bruce Winston

Bruce Winston is 65 years old and the younger son of the famous jeweler, Harry

Winston, Defendant HWI's founder.   His older brother, Ronald Winston, took over running the

HWI business following Harry Winston's death in 1978.   Bruce was a 50% owner of HWI, but

took no part (or interest) in running the business, and was eventually bought out by Ronald in

2000.[2]

---

[2] See articles attached as Exhibits 3, 4, 5 and 7 to Plaintiff's Notice of Reliance filed August 14, 2009, attached as
Exhibit A to the Declaration of Mary R. True ("True Dec."); see also Complaint at ¶ 10.

Approximately one year after he sold his interest in the HWI business, Bruce (then 58 years old), and an investor began Plaintiff BWGC, Bruce's first venture into the jewelry industry.[3]  In June of 2002, HWI learned of an emerald and diamond ring marked "Bruce Winston" that was being offered for sale by Sotheby's.[4]  According to documents produced by BWGC in discovery in the TTAB Opposition, BWGC's sales of jewelry under the BRUCE WINSTON mark did not begin until 2002 and have continued in the same limited fashion to the present.[5]  In its Complaint, BWCG states that these sales have totaled some $16 million over the past eight years.[6]  BWGC has conducted only limited advertising, and as of February of 2008, had created "a few dozen pieces" of jewelry.  It has never had a retail or internet presence.[7]

In July of 2002, BWGC's trademark application for BRUCE WINSTON was published for opposition, which HWI timely opposed in September of 2002.  Opposition No. 91153147 has been ongoing ever since, and as will be demonstrated, the proceedings have been vigorously and extensively prosecuted by both sides.[8]  Nevertheless, HWI's position regarding Bruce Winston's use of the BRUCE WINSTON mark on jewelry has never changed:  HWI does not object to Bruce's limited use of his name during his lifetime to sell jewelry, but does object to his (or BWGC) obtaining a Federal trademark registration for the mark.  Thus, because the TTAB deals

---

[3]  Factual support can be found at pages 61-85 of the March 2, 2006 Deposition of Bruce Winston taken in the TTAB Opposition. The Deposition has been declared confiential by the parties and has been filed under seal with the TTAB. HWI can provide this evidence to the Court upon entry of an appropriate Confidentiality Order.

[4]  Complaint at ¶ 15.

[5]  Factual support can be found at Exhibit 5 to March 2, 2006 Deposition of Bruce Winston and Exhibit 19 to Deposition of Eli Nhaissi. These Depositions and their exhibits have been declared confidential by the parties and have been filed under seal with the TTAB. HWI can provide this evidence to the Court upon entry of an appropriate Confidentiality Order.

[6]The invoices that can be found at Exhibit 5 to March 2, 2006 Deposition of Bruce Winston show that many of these sales were to wholesale clients and/or were made outside the United States. By way of contrast, HWI sales for FY 2002 through FY 2009 were in excess of $1.4 billion. See "Harry Winston Group Consolidated Net Sales", attached as Exhibit B to the True Dec.

[7]  Factual support can be found at  Exhibit 4 to Deposition of Bruce Winston, Exhibits 21 and 22 to Deposition of Eli Nhaissi, and pages 26-27, 123 and 113 from the deposition of Eli Nhaissi.. These Depositions and their exhibits have been declared confidential by the parties and have been filed under seal with the TTAB. HWI can provide this evidence to the Court upon entry of an appropriate Confidentiality Order.

[8]  The docket for Opposition No. 91153147 is attached as Exhibit C to the True Dec.

solely with issues of registration, it is (and has been) the most appropriate forum for adjudicating the only disputed issue between the parties.

### B.    The Opposition Proceedings – Procedural History

Following the filing of the Notice of Opposition on September 16, 2002, the parties engaged in an initial round of discovery, including the discovery deposition of Ronald Winston in July of 2003.  After numerous requests for extensions of the discovery period by both sides, the proceedings were suspended in December of 2003 so that the parties could discuss possible settlement.  The discussions were unsuccessful, the proceedings resumed in June of 2005, and discovery began in earnest.

More written discovery was exchanged and Bruce Winston was deposed in March of 2006.  At that deposition, Bruce Winston gave testimony that appeared to contradict an earlier sworn Declaration about his life-long reputation as a jeweler that he had made to the Trademark Examiner who subsequently approved the BRUCE WINSTON application for publication. Consequently, HWI sought leave to amend its Notice of Opposition to add a claim for fraud on the PTO, and BWGC vigorously opposed by, *inter alia*, filing another sworn Declaration by Bruce Winston that appeared to contradict his deposition testimony.[9]

HWI ultimately prevailed on its motion for leave to amend its Notice of Opposition[10], and BWGC filed its Answer, which included a Counterclaim to cancel HWI's pleaded registrations, in September of 2006.[11]  HWI sought leave to conduct a second discovery deposition of Bruce Winston regarding the statements about his life-long reputation as a jeweler

---

[9] See Dkt. No. 35 and Dkt. No. 40, Exhibit C to the True Dec.

[10] See Dkt. No. 48, Exhibit C to the True Dec.

[11] See Dkt. No. 51, Exhibit C to the True Dec.  It bears noting that because of this Counterclaim to cancel the HWI registrations, the pending Declaratory Judgment action will not fully resolve the dispute between the parties. Moreover, BWGC has not included a claim to cancel any HWI marks in its DJA Complaint, so even if this Court accepts jurisdiction, at the conclusion of the case the Opposition before the TTAB will resume.

made in his second Declaration[12] (again, vigorously opposed by BWGC)[13], and while HWI ultimately prevailed, the proceedings were suspended from October of 2006 until April of 2007 pending the Board's decision on that Motion.[14]

Another round of depositions and discovery ensued, including the second deposition of Bruce Winston in February of 2008.  Following these depositions, BWGC filed a Motion to Strike and a Motion to Compel, which caused the proceedings to once again be suspended in April of 2008 pending the TTAB's decision on BWGC's Motion.[15]  The Board issued its decision denying BWGC's Motion to Compel in September of 2008.[16]  HWI then filed its Motion for Summary Judgment on its claim of fraud in November of 2008.[17]  The Motion was not fully briefed until February of 2009, and was denied by the Board in April of 2009.[18]  The Board reset the Trial dates, and after several extensions, HWI finally began its thirty day Trial period on August 5, 2009.

C.    The Evidence Submitted During HWI's Trial Period

Between August 5, 2009 and the date the TTAB Opposition was suspended due to the filing of this DJA proceeding on August 20, 2009, HWI submitted substantial evidence in support of its Opposition to the registration of the BRUCE WINSTON trademark.[19]  The parties stipulated to the submission into evidence of the following declarations and discovery deposition transcripts[20]:

1.    July 7, 2003 Deposition of Ronald Winston

---

[12] See Dkt. No. 54, Exhibit C to the True Dec.
[13] See Dkt. No. 63, Exhibit C to the True Dec.
[14] See Dkt. No. 64, Ex. C to the True Dec.
[15] See Dkt. No. 79, Ex. C to the True Dec.
[16] See Dkt. No. 88, Ex. C to the True Dec.
[17] See Dkt. No. 90, Ex. C to the True Dec.
[18] See Dkt. No. 107, Ex. C to the True Dec.
[19] See Dkt. Nos. 116-120, 122-23, 125-27 and 129-30, Ex. C to the True Dec.  The Notices of Reliance, Dkt. Nos. 131-36 were filed via US Mail prior to the TTAB Proceeding being suspended.
[20] See Dkt. Nos. 114-15, Ex. C to the True Dec

2.    May 22, 2006 Deposition of Carol Brodie Gelles

3.    May 25, 2006 Deposition of James Haag

4.    May 24, 2006 Deposition of Robert Scott

5.    February 26, 2006 Deposition of Robert Scott

6.    February 28, 2008 Deposition of Suzy Korb

7.    March 2, 2006 Deposition of Bruce Winston

8.    February 27, 2008 Deposition of Eli Nhaissi

9.    February 28, 2008 Deposition of Bruce Winston

10.    February 6, 2002 Declaration of Bruce Winston

11.    April 17, 2006 Declaration of Bruce Winston

HWI had also taken the testimony of two non-party witnesses, Mitchell Dustin and Elaine Howard, in Columbus, Ohio. Mr. Dustin's testimony was being submitted by HWI as an expert in the jewelry appraisal field to demonstrate the potential for confusion in the secondary market between Harry Winston and Bruce Winston jewelry. Ms. Howard's testimony was being submitted by HWI as a person in the jewelry industry whose knowledge of Bruce Winston was limited to awareness of the long-running litigation between Bruce and his brother Ronald.

HWI was also preparing to take the testimony of the following witnesses who would be testifying on behalf of HWI, and who would provide fact and expert testimony as to each of the *DuPont* factors considered by the Board in determining likelihood of confusion for the purposes of granting or refusing trademark registration.[21]   These testimony depositions had been scheduled to take place the week of August 24, 2009 – just four days after BWGC filed its Complaint for Declaratory Judgment.

---

[21] *In re E.I. DuPont de Nemours & Co.*, 476 F.2d 1357 (CCPA 1973). While not identical, the *DuPont* factors are very similar to the Second Circuit's test for likelihood of confusion set forth in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961).

1.  Edward Lewand – Mr. Lewand, an expert jewelry appraiser, was to testify about the fame of the Harry Winston and Winston name for fine jewelry and the potential for confusion with fine jewelry being sold under the BRUCE WINSTON mark.

2.  Susy Korb – Ms. Korb, HWI's former Chief Marketing Officer and Creative Director (and now a consultant to HWI), was to testify as the Custodian of Records to authenticate more than seventy years of HWI advertising, press clippings, media articles, books and other materials that HWI was submitting, comprising several thousand pages, to establish the fame and renown of the marks HARRY WINSTON and WINSTON for fine jewelry.  Ms. Korb was also designated to testify about HWI's past, present and future advertising and marketing activities, budgets and advertising spending, promotional events, such as the Academy Awards, and other evidence of the fame and renown of the HARRY WINSTON and WINSTON marks and the potential for confusion with fine jewelry being sold under the BRUCE WINSTON mark.

3.  Robert Scott – Mr. Scott, HWI's Chief Financial Officer, was to testify regarding the dollar amount of HWI's sales, the limited extent of Bruce Winston's "employment" with HWI and his lack of reputation in the jewelry industry, the valuation of the HARRY WINSTON and WINSTON trademarks, and HWI's efforts to enforce its trademark rights against third parties.

4.  Tom Burstein – Mr. Burstein, HWI's V.P. of Retail Sales, was to testify regarding the fame of the Harry Winston and Winston name for fine jewelry, the potential for confusion in the primary and secondary markets with fine jewelry being sold under the BRUCE WINSTON mark, Bruce Winston's lack of reputation in the jewelry industry, and the overlap in potential purchasers of fine jewelry under the HARRY WINSTON and BRUCE WINSTON marks.

5.  Pilar Merenes – Ms. Merenes, a long-time employee of HWI and former executive assistant to Mr. Ronald Winston, was to testify regarding the limited extent of Bruce Winston's "employment" with HWI, his lack of reputation in the jewelry industry, and his lack of interest and participation in the HWI business.

6.  David Schwartz – Mr. Schwartz, HWI's V.P. of Jewelry Merchandising, was to testify regarding the use of the HARRY WINSTON and WINSTON marks on jewelry over the years, and the potential for confusion in the primary and secondary markets with fine jewelry being sold under the BRUCE WINSTON mark.

After seven years, BWGC knew that the jig was up.  The overwhelming evidence of i)

the fame of the HARRY WINSTON and WINSTON marks for jewelry[22], and ii) the potential for

---

[22] Evidence of the fame of the HARRY WINSTON and WINSTON marks owned by Plaintiff HWI could likely have been dispositive of the TTAB's decision. The TTAB's reviewing court, the Court of Appeals for the Federal Circuit, has held that fame of an opposer's mark or marks, if it exists, plays a "dominant role in the process of balancing the DuPont factors," *Recot Inc. v. Becton*, 214 F.3d 1322, 1327 (Fed. Cir. 2000) and "[f]amous marks thus enjoy a wide latitude of legal protection." *Id.* This is true because famous marks are more likely to be remembered

likelihood of confusion with jewelry marked with the BRUCE WINSTON mark that HWI was preparing to present to the TTAB would likely result in registration of the BRUCE WINSTON mark being refused.  In a desperate attempt to avoid getting such an adverse judgment from the TTAB, BWGC took the only course available to it:  it filed this Declaratory Judgment Action.

**III.    ARGUMENT**

   A.    There is No Substantial Controversy Between the Parties of Sufficient Immediacy and Reality to Warrant the Issuance of a Declaratory Judgment

The Declaratory Judgment Act (28 U.S.C. § 2201(a)) ("DJA") states that: "in a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and legal relations of any interested party seeking such declaration."    In the 2007 decision *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007), the Supreme Court enunciated the "requirements" for a declaratory judgment action to meet the "actual controversy" standard of the DJA.  Admitting that its test "do[es] not draw the brightest of lines between those actions that satisfy the case-or-controversy requirement and those that do," the Court stated:

> Basically, the question in each case is whether the facts alleged, under all circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

*MedImmune*, 549 U.S. at 127.

According to the Court, in order to meet this test, the dispute must be:

> definite and concrete, touching the legal relations of parties having adverse legal interests; and it must be real and substantial and admit of specific

---

and associated in the public mind than a weaker mark, and are thus more attractive as targets for would-be copyists. *Id.* Indeed, "[a] strong mark ... casts a long shadow which competitors must avoid." *Kenner Parker Toys, Inc. v. Rose Art Industries, Inc.*, 963 F.2d 350, 353, (Fed. Cir. 1992). A famous mark is one "with extensive public recognition and renown." *Id.*

relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be under a hypothetical state of facts.

*Id.*

The party seeking a declaratory judgment in federal district court bears the burden of establishing the existence of an actual controversy. *Cardinal Chem. Co. v. Morton Int'l, Inc.,* 508 U.S. 83, 96 (1993) (citing *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240-41 (1937)). And even if the declaratory judgment plaintiff meets that burden, courts have discretion to decline to exercise that jurisdiction, so long as they employ "considerations of practicality and wise judicial administration." *Wilton v. Seven Falls Co.,* 515 U.S. 277, 288 (1995).

While *MedImmune* set a more lenient standard for invoking jurisdiction under the DJA, it by no means opened the courthouse doors to controversies that were merely conjectural or speculative. *AARP v. 200 Kelsey Associates, LLC et al,* 2009 U.S. Dist. LEXIS 969 (S.D.N.Y. January 9, 2009) (Lynch, J.). BWGC has not met its burden of establishing that this controversy is anything other than that. The Complaint for Declaratory Judgment makes three allegations which purport to demonstrate the existence of an "actual controversy": i) that "HWI has communicated, and continues to communicate, to the jewelry industry that BWG is infringing its trademarks and not authorized to use the BRUCE WINSTON Trademarks" (Complaint at ¶ 24); ii) HWI has made "ongoing assertions in the TTAB proceedings that BWG is engaging in impropriety by its use of the BRUCE WINSTON trademark" (Complaint at ¶ 27); and iii) the parties have engaged in unsuccessful settlement negotiations (Complaint at ¶ 23). According to BWGC, "[t]he foregoing makes it manifest that Defendants assert BWGC's current marketing activities infringe their trademark rights and will vigorously challenge BWG's Fall marketing plans." (Complaint at ¶ 27)

These unsupported, vague allegations do not establish that there is any "actual controversy" between the parties other than the right of BWGC to register the BRUCE WINSTON mark. BWGC's "belief" that HWI is communicating to the jewelry industry that BWGC is infringing the WINSTON marks is not supported by any facts other than BWGC's extrapolations as to conversations BWGC purportedly had with Sotheby's[23] -- and even then, BWGC can only allege that it was "advised that Sotheby's could not accept a BRUCE WINSTON marked piece." (Complaint at ¶ 25)  There is no indication in the Complaint (and there is certainly no evidence otherwise) that Sotheby's is receiving instructions from HWI to reject pieces marked BRUCE WINSTON.  Indeed, it is just as plausible to assume that Sotheby's is rejecting BRUCE WINSTON pieces (if that is, in fact, the case) because it doesn't think that BRUCE WINSTON jewelry items would sell well at its auctions.

Moreover, HWI's "ongoing assertions in the TTAB proceedings" by necessity and law only relate to BWGC's right to register the BRUCE WINSTON mark, and HWI's belief that registration should be refused on the grounds that the BRUCE WINSTON mark "consists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office . . as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive."  15 U.S.C. § 1052(d).  This is not a charge of trademark infringement.  Indeed, it is well settled (and still good law) that the filing and prosecution of an Opposition proceeding in the TTAB is not, *per se,* sufficient to create an "actual controversy" under the DJA.  See, e.g., *Topp-Cola Co. v. Coca-Cola Co.,* 314 F.2d 124 (2d Cir. 1963); *Barbarian Rugby Wear, Inc. v. PRL USA Holdings, Inc.,* 2006 U.S. Dist. LEXIS 50179 at *10

---

[23] The references in the Complaint to actions taken by HWI *in 2002* with respect to BWGC's attempt to place a ring in a Sotheby's auction – which occurred *prior to* the institution of the Opposition proceedings – do not support a finding that this is a controversy "of **sufficient immediacy and reality** to warrant the issuance of a declaratory judgment."

(S.D.N.Y. 2006); *Progressive Apparel Group, supra*, 1996 U.S. Dist. LEXIS 1292 at \*2 (S.D.N.Y. 1996); *American Pioneer Tours Inc. v. Suntrek Tours Ltd.*, 1998 U.S. Dist. LEXIS 1527 (S.D.N.Y. 1998); *Bausch & Lomb, Inc. v. CIBA Corp.*, 39 F. Supp. 2d 271 (W.D.N.Y. 1999); *Goya Foods, Inc. v. Tropicana Products, Inc.*, 666 F. Supp. 585 (S.D.N.Y. 1987).

Finally, failed settlement negotiations – particularly negotiations that have been off and on for the better part of seven years – certainly do not rise to the level of an imminent threat of litigation. BWGC cannot point to, and did not allege, any statements made by HWI at any point in this protracted dispute in the TTAB where HWI has threatened litigation. BWGC did not attach any of the many letters exchanged between Counsel for the parties over the years concerning settlement offers. Examples of such correspondence are attached to illustrate how the nature of this dispute has remained unchanged over the years, and how it has *never* involved the threat of litigation[24]:

March 29, 2004 letter from Glenn F. Ostrager, counsel for BWGC, to Joseph R. Dreitler, counsel for HWI:

> *As I understand your position, Harry Winston, Inc. is agreeable to a settlement that permits Bruce Winston to use his name in the jewelry field in the United States only, subject to the restriction that all rights in the BRUCE WINSTON trademark shall be personal to Bruce Winston and terminate on his death.*

June 13, 2007 letter from Joseph R. Dreitler to Glenn F. Ostrager:

> *My client is willing, for purpose of settlement discussions, to have Bruce Winston use his personal name in connection with his own business during his lifetime under certain conditions. However, once Bruce Winston passes, my client is not willing to see this name used on a competitive jewelry business, much less have use of the name expanded by unrelated third parties/corporations . . To the extent your client has an interest in resolving this matter under*

---

[24] See letters attached as Exhibits D-G to True Dec. These letters are not being submitted for the purpose of establishing liability. Rather, they are being submitted to establish this Court's lack of jurisdiction, a permitted purpose under FRE 408(b).

> terms that would permit his use of his name (under certain
> conditions) during his lifetime, we are very much interested in
> beginning a dialogue that ends this dispute.

February 18, 2008 letter from Joseph R. Dreitler to Glenn F. Ostrager:

> As you so aptly pointed out during our call, this matter relates to a
> trademark opposition, not a civil suit to enjoin use . . . Neither of
> us wants the unfortunate litigation in the past to resume upon Mr.
> Winston's death.   HWI certainly does not want to affirmatively
> agree to anything that might find itself in litigation with Mr.
> Winston' estate. . . my client would agree that so long as the Bruce
> Winston Gem Corp. was controlled and operated by [Bruce]
> Winston, his wife or his children, HWI would not object to the use
> of his name on certain jewelry items under certain restrictions to
> be negotiated, including that there be no "Bruce Winston" retail
> stores, no sales in retail stores or internet sales.

May 21, 2009 letter from Glenn F. Ostrager to Joseph R. Dreitler:

> It is my understanding that a principal concern of Harry Winston
> is to bar third party registration of "Winston" trademarks.

The facts of this case have not changed one iota in seven years.  Bruce Winston is a part owner of a company that sells relatively small amounts of jewelry bearing his name through face-to-face sales.  If BWGC had brought a declaratory judgment action back in 2002 when HWI informed BWGC that it objected to the inclusion of the Bruce Winston ring in the Sotheby's auction, there may have been some merit to an argument that BWGC was not sure if HWI would file an infringement action against it.  But now, after seven years without a single threat of litigation by HWI, it strains credulity to argue that the parties are suddenly at a point where this controversy merits immediate declaratory relief.

Clearly, this is not a case where "opposition proceedings at the TTAB represent only the most recent coercive action taken by the defendant and not the only one." *Barbarian Rugby Wear, Inc. v. PRL USA Holdings, Inc.*, 2006 U.S. Dist. LEXIS 50179 at *10 (S.D.N.Y. 2006) (Koeltl, J.).  Indeed, since this dispute began, the opposition proceedings remain the only action

HWI has ever taken to protect its interests.  In light of the complete lack of evidence of any controversy of "sufficient immediacy and reality to warrant the issuance of a declaratory judgment," BWGC's motion must fail.

As the Western District of New York noted in *Bausch & Lomb, Inc., supra,* "given the lack of evidence that [the declaratory judgement defendant] was likely to bring an infringement action against [the plaintiff], allowing the action to go forward would encourage forum shopping and the filing of premature, purely anticipatory declaratory judgment complaints, which are not among the purposes the Declaratory Judgment Act was designed to promote." *Id.* at 275, citing *Eli's Chicago Finest, Inc. v. Cheesecake Factory, Inc.,* 23 F. Supp. 2d 906, 908 (N.D.Ill. 1998).

B.   Plaintiff Has Not Demonstrated the Parties are in Adversarial Conflict by Alleging Conduct Evidencing a Definite Intent and Apparent Ability to Commence Use of the Bruce Winston Mark in an Infringing Manner

In order to establish the existence of an actual case or controversy, BWGC must also establish that it has "engaged in a course of conduct which has brought it into adversarial conflict with the defendant." *Starter Corp. v. Converse, Inc.,* 84 F.3d 592, 595 (2d Cir. 1996), citing *Windsurfing Intern. Inc. v. AMF Inc.,*  828 F.2d 755, 757-58 (Fed. Cir. 1987).  See also *Pocketmedicine.com, Inc. v. John Wiley & Sons, Inc.,* 2006 U.S. Dist. LEXIS 13617 (S.D.N.Y. Mar. 23, 2006).  To do this, BWGC must show that it has "a definite intent and apparent ability to commence use" of the BRUCE WINSTON mark in a way that would be infringing of the WINSTON and HARRY WINSTON marks. *Starter Corp.,* 84 F.3d at 595.[25]  However, the only

---

[25] The "intent and ability" prong of the *Starter Corp.* test is still a requirement in order for an actual controversy to exist. As Judge Lynch recently explained:

the 'intent and ability' test stems from the portion of the [Starter Corp.] test dealing with the extent to which the parties have been sufficiently brought into adversarial conflict with one another, and nothing in *MedImmune* purports to have changed the fundamental requirement of adversity.  Moreover, the thrust of the 'intent and ability' test is the immediacy of the dispute, a requirement the validity of which *MedImmune* specifically upheld.

"definite intent" BWGC has shown is its intent to get this matter out of the TTAB now that it is in the Trial period and a decision by the TTAB is imminent.

It is important to note that BWGC has been making use of the BRUCE WINSTON mark in the same limited manner since at least 2002. Paragraph 14 of the Complaint sets forth the nature of that use: the mark is used on a sign at its business offices, on stationery and business cards, on jewelry boxes and on the jewelry itself. Sales of products bearing the BRUCE WINSTON mark have been "in excess of $16 million" from 2002 to the present. HWI has not objected to this very limited use, as long as Bruce Winston remains active in the business. Thus, in order for BWGC to show that there is a controversy of "sufficient immediacy and reality" to invoke this Court's jurisdiction under the DJA, it must demonstrate that it has the present intent and ability to significantly expand that use – not just the desire to do so. *Starter Corp., supra* at 596.

The Complaint mentions two things that BWGC purportedly plans to do to expand its activities: attend a trade show it alleges is being held at the Javits Center in December 2009 and prepare a Fall advertising campaign which would include placement of advertisements "in the New York Times and other media." Complaint at ¶ 26. BWGC alleges that it has retained an advertising agency and "expects" to begin its advertising campaign "within the next several weeks." *Id.* But BWGC provides no details of the type, size, costs and scope of such activities. The advertising agency is not identified, no storyboards or artwork for advertising or even contracts for media buys for the Fall advertising campaign are attached.[26] There is no explanation of who the participants and attendees of the trade show are, and why BWGC's

---

*AARP, supra* at *20.

[26] Indeed, while such materials (if they exist) would be responsive to discovery requests in the Opposition proceedings which BWGC is obligated to supplement, BWGC has never provided HWI with any evidence of an intent to expand use of the BRUCE WINSTON mark. See, e.g., Document Request Nos. 7 and 15, Opposer's First Set of Requests for Production of Documents, attached as Ex. H to True Dec.

attendance would bring it into conflict with HWI. These allegations, without more, do not evidence concrete efforts to expand use of the BRUCE WINSTON mark to the point where BWGC and HWI would be in "adversarial conflict."

      C.    <u>BWGC is Asking this Court to Issue an Advisory Opinion</u>

"A party has a right to seek declaratory judgment where a reasonable apprehension exists that *if it continues an activity* it will be sued by another party." *800-Flowers, Inc. v. Intercontinental Florist*, 860 F. Supp. 128, 132 (S.D.N.Y. 1994) (emphasis added); *Great American Ins. v. Houston General Ins.*, 735 F. Supp. 581, 585 (S.D.N.Y. 1990) ("[a] declaratory judgment is an opportunity for a party to a ripe legal controversy to have that controversy resolved"). But a party does not have the right to seek a ruling *before* a potentially infringing activity even occurs. In this case, BWGC is seeking an advisory opinion from this Court that will judicially approve its use of BRUCE WINSTON as a trademark regardless of what BWGC actually does, now and for all time. The Federal Circuit (interpreting Second Circuit law) hit the nail on the head when it called out AMF for a similar course of conduct in *Windsurfing Intern., supra*:

> In its complaint and counterclaim, AMF alleged merely that "AMF is interested in using the mark descriptively in connection with its products." AMF cites testimony that AMF has a "desire" to use "windsurfer" in its advertising and promotion, and that other members of the trade have the same "desire." *Rather than use the mark, get sued, and fight it out in court, AMF was saying, "We would like to use the mark, but before we do, we want a court to say we may do so safely."* Thus AMF's complaint and counterclaim sought an advisory opinion, something a federal court may not give.

*Windsurfing Intern., supra* at 758, citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241 (1937) (emphasis added). <u>See also</u> *Starter Corp. v. Converse, Inc.*, 84 F.3d 592, 595 (2d Cir. 1996) ("If both a federal question and an actual controversy exist, then declaratory judgment

jurisdiction may appropriately be exercised.  If no such controversy exists, however, the courts are prohibited from rendering an advisory opinion which would be beyond [the court's] constitutional power."); *Pocketmedicine.com, Inc. v. John Wiley & Sons, Inc.*, 2006 U.S. Dist. LEXIS 13617 (S.D.N.Y. Mar. 23, 2006).

Even accepting for the sake of argument that BWGC is actually planning to expand its marketing, it would be impossible for this Court to guess at what those plans are, much less determine at this time what impact would actually occur in the marketplace, so that this Court would be able to assess whether those future plans – and presumably, others – would infringe on HWI's trademark rights.  That is precisely why the exercise of Federal jurisdiction under the DJA must be limited to only those disputes which are:

> definite and concrete, touching the legal relations of parties having adverse legal interests; and it must be real and substantial and admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be under a hypothetical state of facts.

*MedImmune*, 549 U.S. at 127.

### D.   The Declaratory Judgment Act May Not be Used to Short Circuit Administrative Remedies

The fact that the Opposition proceedings in the TTAB regarding the registrability of the BRUCE WINSTON mark were in the midst of Trial when BWGC made the tactical decision to file this Declaratory Judgment action cannot be ignored.  The DJA is discretionary: "Even after a plaintiff demonstrates that the case or controversy requirement has been met, the permissive language of §2201(a) gives the district court discretion to determine whether or not it should actually exercise its declaratory judgment authority." *AARP*, 2009 U.S. Dist. LEXIS at *11.

The PTO has well-established administrative procedures to determine the registrability of federal trademark applications.   The U.S. Supreme Court has clearly stated the policy reasons why parties should not use the DJA to short-circuit the administrative process:

> [T]he declaratory judgment procedure will not be used to preempt and prejudge issues that are committed for initial decision to an administrative body or special tribunal any more than it will be used as a substitute for statutory methods of review . . Responsibility for effective functioning of the administrative process cannot be thus transferred from the bodies in which Congress has placed it to the courts.

*Public Service Commions v. Wycoff Co.,*  344 U.S. 237 (1952).

Courts within this Circuit, including this Court, have long deferred to the expertise of the PTO in determining those matters properly before it.  See, e.g., *Englishtown Sportswear, Ltd. v. Tuttle,* 547 F. Supp. 700, (S.D.N.Y. 1982), citing *Fairchild, Arabatzis & Smith, Inc. v. Sackheim,* 451 F. Supp. 1181, 1184 (S.D.N.Y. 1978). ("Where Congress has built up a well-defined administrative system for the resolution of a class of disputes . . . courts are reluctant either to interrupt or anticipate agency determinations because such bypasses seriously impair expeditious resolution and result in the forfeiture of administrative expertise.").

Indeed, the Second Circuit has held that a district court abused its discretion in entertaining a declaratory judgment action when the parties were already involved in an opposition proceeding in Puerto Rico over the trademarks at issue in the action and *where there was no threat of an infringement suit.*  See *Topp-Cola v. Coca-Cola Company,* 314 F.2d 124 (2d Cir. 1963). In *Topp-Cola,* the plaintiff had filed an application to locally register its "Topp Cola" mark in Puerto Rico and defendant Coca-Cola opposed, arguing a likelihood of confusion with its registered "Coca Cola" mark. *Id.* at 125.  Plaintiff then brought a declaratory judgment action seeking a declaration of non-infringement and a decree enjoining defendant from pursuing the opposition. *Id.*  The Second Circuit found that:

apart from [its finding of no actual controversy], it is clear that no useful purpose would be served by an adjudication in the district court of the plaintiff's right to registration in Puerto Rico or the defendant's right to oppose such registration. The plaintiff is not in the position of one who is threatened with legal proceedings but does not know where or when the blow will fall. The proceedings in Puerto Rico and the defendant's opposition are actual; the right of both parties will be determined in due course. *The Declaratory Judgment Act may not be used simply to remove a controversy from a forum where it properly belongs.*

*Id.* at 126 (emphasis added). Accordingly, the Second Circuit held that, because the DJA "is an authorization, not a command," the district court had abused its discretion in accepting jurisdiction over the dispute. *Id.* at 127. See also *American Pioneer Tours, Inc. v. Suntrek Tours, ltd.*, 1998 U.S. Dist. LEXIS 1527 at *13 (S.D.N.Y. 1998) citing *Topp-Cola*, 314 F.2d at 126 ("if the parties continue to be unable to reach an amicable agreement, the cancellation proceedings that have already been initiated at the U.S. Trademark Office will assist the parties in resolving their dispute. Thus, 'the right of both parties will be determined in due course.'").

In this case, "the right of both parties" was very close to being determined by the PTO after seven years of proceedings that included numerous depositions, the production of thousands of pages of documents, and the preparation and commencement of extensive Trial testimony and exhibits. These proceedings have certainly been pursued vigorously by both parties, but there have been no changes in the actual positions of either party which would warrant this Court's exercise of its jurisdiction in derogation of the authority of the PTO to determine the registrability of the BRUCE WINSTON mark. BWGC must first exhaust the administrative remedies it has been pursuing for seven years before resorting to the courts.

Moreover, BWGC's request that this Court step into the shoes of the PTO and issue a registration to BWGC for the BRUCE WINSTON mark is likewise beyond the authority granted to the Federal courts under Section 37 of the Lanham Act, because the independent basis upon

which BWGC purports to assert Federal jurisdiction in this action – a determination of whether its **use** of the BRUCE WINSTON mark infringes on HWI – can be resolved without determining whether the mark is registrable.  See, e.g., *Manganaro Foods, Inc. v. Manganaro's Hero-Boy, Inc.*, 2002 U.S. Dist. LEXIS 12844 at *33-34 (S.D.N.Y. July 12, 2002)(Koeltl, J.):

> In this case, there is no basis to direct registration of the plaintiff's alleged mark. Although the plaintiff has raised a claim for trademark infringement and false designation of origin pursuant to Section 43(a) of the Lanham Act, in deciding this claim it was unnecessary to determine whether the plaintiff's mark was registrable. . . This is also not a case in which the plaintiff could attempt to leverage a challenge to the defendant's registered marks into a basis for obtaining registration of its proposed mark, if such a claim were possible, because the plaintiff has not effectively challenged the defendant's registrations. Hence, there is nothing in the register that needs to be rectified to conform to the rulings made in this case. In these circumstances, Section 37 does not authorize the Court to direct the registration that the plaintiff seeks.

BWGC is clearly still seeking trademark registration of the term BRUCE WINSTON. Because this Court has no authority – or need -- to order the PTO to grant BWGC a registration, that is all the more reason this case should be dismissed and sent back to the forum which does have the authority to determine whether the PTO should allow the BRUCE WINSTON mark to be registered.

Finally, inasmuch as the only real and actual dispute between the parties relates solely to registration of the BRUCE WINSTON mark, district court review of this issue would be a substantial waste of the resources of the parties, the TTAB and this Court. As noted, the parties have already presented a substantial, detailed written record to the TTAB on this issue, and were in the process of presenting even more evidence and testimony during the Trial phase of the Opposition. However, "[w]hen registration decisions of the Patent and Trademark Office are litigated in a district court pursuant to 15 U.S.C. § 1071(b), the proceeding is virtually *de novo*,

since additional cross-examination and presentation of additional testimony is permitted." *Goya Foods, Inc. v. Tropicana Products, Inc.*, 846 F.2d 848, 853 (2d Cir. 1988), citing *Continental Connector Corp. v. Continental Specialties Corp., supra*, 413 F. Supp. 1347, 1350 (D. Conn. 1976) (citations omitted).  Clearly, judicial economy is not served by re-starting this proceeding *de novo* after seven years, nor are the interests of the parties.  Such tactics make a mockery of both judicial and administrative dispute resolution.

## IV.    CONCLUSION

After seven years, it was clear to BWGC that the opposition proceedings were finally heading to a resolution, and likely one that was not going to be favorable.  Bolting into this Court was nothing more than a cynical attempt to further delay the inevitable decision by the TTAB, which would have been based upon a thorough and exhaustive testimonial and evidentiary record -- precisely the opposite of the expeditious resolution of disputes that the DJA is intended to achieve.  For all the foregoing reasons, HWI respectfully requests that this action be dismissed, or in the alternative, stayed pending resolution of the opposition proceedings before the TTAB.

Respectfully submitted,

Dated:  October 9, 2009

BRICKER & ECKLER LLP

FROSS ZELNICK LEHRMAN & ZISSU, P.C.
Roger L. Zissu
866 United Nations Plaza
New York, New York 10017
Telephone: (212) 813-5900
Ddonahue@fzlz.com

By: _____
Joseph R. Dreitler (Admitted *pro hac vice*)
Mary R. True (Admitted *pro hac vice*)
100 S. Third Street
Columbus, Ohio 43215
Telephone: (614) 227-2300
Facsimile:  (614) 227-2300
jdreitler@bricker.com
mtrue@bricker.com

*Attorneys for Defendants
Harry Winston, Inc. and Harry Winston S.A.*

20